UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20521-RNS-1

UNITED STATES OF AMERICA

v.                                             UNDER SEAL

THEODORE FARNSWORTH,

Defendant.

_____/

FILED BY_____D.C.

AUG 2 9 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

REPLY IN FURTHER SUPPORT OF
THE GOVERNMENT'S REVOCATION MOTION

The defendant has amply demonstrated that he is unwilling to abide by his release conditions and cannot be trusted to remain on bond while he awaits trial. In the time he has been on pre-trial release, he has withheld from his probation officer basic information about his whereabouts and engaged in deceptive efforts to evade supervision. The defendant lied to the FTC, lied to law enforcement, lied to his probation officer, and has now lied to this Court. This pervasive violative and deceptive behavior while on release warrants detention pending trial.

ARGUMENT

I.     THERE IS CLEAR AND CONVINCING EVIDENCE THAT THE
       DEFENDANT REPEATEDLY VIOLATED HIS CONDITIONS

A. The Defendant Violated His Conditions When He Failed to Report Contact With Law
   Enforcement and Lied to His Probation Officer to Cover-up His Noncompliance

Clear and convincing evidence demonstrates that: (i) the defendant failed to notify U.S. Probation Officer Michael Christopher about contact with law enforcement; and (ii) when questioned regarding this failure, the defendant lied, falsely stating that he had previously provided

the information to USPO Christopher.  (Mot. at 3-6.)[1]

The defendant admits that he did not notify USPO Christopher about contact with law enforcement.  (Opp. at 11-13.)  However, the defendant denies compounding his noncompliance with a lie.  The defendant disputes that he claimed to USPO Christopher that he believed he had previously told USPO Christopher about his law enforcement contact.  (*Id.*)  Instead, the defendant states, in a declaration under the penalty of perjury, that he recalls saying that he did not realize he had to tell USPO Christopher when he affirmatively reached out to police about a crime committed against him.  (Opp. at 7-8, 13; DEX 2 ¶ 9.)  However, notes taken by USPO Christopher on the same day that he spoke to the defendant (July 11, 2023) clearly and unequivocally state:

> USPO questioned Def if he has had any LE contact or concerns. He reported none. He did report he called the police and they responded when him and ▮▮▮▮▮ got into a physical altercation. *He believes he reported this to USPO, which USPO does not recollect.*

(GEX 20 (emphasis added).)[2]

In addition, the defendant's version of the events leading to his contacts with law enforcement is misleading for at least three reasons.  *First*, the defendant and ▮ accused each other of domestic violence and, as a result, sought restraining orders against each other.  (GEX 1, 2.)  *Second*, documentary evidence shows that the defendant submitted a false affidavit under penalty of perjury to initiate a criminal complaint against ▮ (Mot. at 5; *infra* at 6.)  *Third*, video and audio evidence shows that after the defendant submitted his false affidavit, the defendant tracked down and taunted ▮ about ▮ being a sex worker and ▮ imminent arrest.  (GEX 21 ("▮ … going to jail for fucking choking me to death."); *id.* ("[T]here's the prostitute

---

[1] "Mot." refers to the Government's Motion to Revoke the Pre-trial Release of Defendant Theodore Farnsworth, filed under seal August 8, 2023; "Opp." refers to Defendant Theodore Farnsworth's Opposition to the Government's Motion to Revoke Pre-trial Release, filed under seal August 22, 2023; "GEX" refers to the government's exhibits; and "DEX" refers to the defendant's exhibits.

[2] The defendant's submission of a false declaration under penalty of perjury to this Court is a crime under 18 U.S.C. § 1621 and further demonstrates he is unlikely to abide by any conditions.

right there. Look at how good he's looking – the prostitute. 250 bucks an hour, he'll suck your dick all day long. Jam it up your ass."); GEX 22 at 2 ("You're out there fucking working for 250 bucks an hour fucking blowing people ... How many people you have yesterday, six? Seven?")[3]

The defendant had an obvious motive to hide this incident from USPO Christopher: domestic disputes invite home visits from Probation and the defendant wanted to avoid supervision. After        moved out and obtained a restraining order against the defendant, the defendant began paying                       for sex. (GEX 10, 11, 12.) The defendant made his first payment to    on or around May 25, 2023. (Attachment B; GEX 12.) As discussed below, around this same time, the defendant was in Miami and stayed there through at least the end of June 2023. (GEX 18, 19 and 23.)

The defendant did not disclose any of this information to USPO Christopher. To the contrary, when, on July 11, 2023, USPO Christopher confronted the defendant about his whereabouts, the defendant responded he had been in Miami since around July 6, 2023 or July 7, 2023 (GEX 20) and that he was "working on [his] case" (DEX 1 at 122). The defendant's statement to USPO Christopher was, at best, misleading and likely false.

The defendant did not disclose that he had been in Miami between around May 26, 2023 and at least June 30, 2023, and that, for at least part of the Miami trip, the purpose was to spend time with a sex worker. Bank records indicate that throughout the end of May 2023 and all of June 2023, the defendant went on luxury shopping trips; frequented high-end restaurants and clubs; and made thousands of dollars of cash withdrawals from local ATMs, all in Miami. (GEX 18, 19 and 23.) On a recorded call that the defendant made to his sister on or around August 5, 2023, while in custody, the defendant stated that    got a tattoo "two months ago, maybe a month ago, for

---

[3] The video and audio recordings were made by    who provided them to the government.

me in Miami." (GEX 24 at 23.)  Bank records reflect that the defendant paid $1,100.50 to Chapel

Tattoos LLC in Miami Beach on May 30, 2023.  (GEX 23.)

### B.  The Defendant Violated His Conditions by Failing to Provide Notice of Travel

The defendant does not dispute he traveled from New York to Miami without notifying his

Probation Officer about his whereabouts.  Instead, the defendant argues this does not constitute a

violation because his conditions allowed him to "freely travel [*i.e.*, without requesting permission]

between his home in Miami, Florida and his home in upstate New York".  (Opp. at 10-11.)  The

Court should reject this argument for two reasons.

*First*, while the defendant was permitted to travel to the Southern District of Florida, he

was required to provide notice to his Probation Officer.  The defendant's conditions explicitly

require him to report to his Probation Officer as directed.  (ECF 13.)  As corroborated by

contemporaneous notes, the defendant's Probation Officer twice directed the defendant to provided

notice before he traveled outside of the Northern District of New York (including to permitted

areas like the Southern District of Florida).  (GEX 25, 26, 27.)  The defendant's failure to provide

notice of his whereabouts is therefore a clear, knowing violation.

*Second*, the defendant's argument is based on a falsehood, namely that he traveled to "his

home" in Miami.  (Opp. at 10-11.)  The defendant did not reside at the home address that he

previously provided to the Court.  (ECF 13.)  In fact, as defendant's own exhibits show, when he

was in Miami, he stayed at an Airbnb and a hotel.  (DEX 1 at 146.)  Recorded phone calls further

prove that the defendant does not actually have a home in Miami or anywhere else in the Southern

District of Florida.  While in custody, the defendant made numerous recorded calls in which he

implored his associates to help him obfuscate his falsehood by renting an apartment in his name

as soon as possible. (GEX 24 at 15, 34, 39, 49-52.) In one recorded call, the defendant told ███ ███ (who owns the address that the defendant had used as his own):

| | |
|---|---|
| Defendant: | "My biggest problem, my biggest problem is that I've got to have a place in Florida for address and stuff, you know so …. |
| ███ | "Well I'll tell you what, you can always use Claudia's house. She's already offered you her room. She's got a spare room there. …" |
| Defendant: | "Well, no, no, no, I can't do that though … they come and search the house every week ███ Can you imagine?" |

(*Id.* at 69-70.)[4]

### C. The Defendant Violated His Conditions by Failing to Comply with His Probation Officer's Request for Information About His Whereabouts

Clear and convincing evidence also demonstrates that the defendant did not comply with USPO Christopher's direction to provide documentation regarding his July trip to Miami. (Mot. at 7.) Specifically, USPO Christopher emailed the defendant three times requesting documentation of his stated purpose for traveling to Miami, the duration of his stay, and where he stayed. (GEX 28, 29 and 30.)[5] The defendant ignored USPO Christopher's requests. (GEX 25.) The defendant's noncompliance with straightforward requests supports the inference that he was not truthful with USPO Christopher about his Miami trip. His noncompliance is also an independent violation and further demonstrates he is unlikely to comply with any conditions.

### II.   THERE IS PROBABLE CAUSE TO BELIEVE THE DEFENDANT COMMMITED MULTIPLE CRIMES WHILE ON PRE-TRIAL RELEASE

### A. There Is Probable Cause the Defendant Committed Perjury

---

[4] In another recorded call, the defendant told an associate, ███ ███ : "You've got to make sure you book an Airbnb for me with my card right, whatever, for like three weeks there because I have to have an address for Miami … *it's critical* …. I can use [the Airbnb] for temporary and then I got look at the uh rentals, so make sure you dig up a bunch of rentals." (*Id.* at 34 (emphasis added).) *See also id.* at 50 ("I got to have it cause now Parole or – whatever they're called – Probation – right? They want to make sure it's done, I'm there, I'm blah blah blah – they come by and search it and all that stuff. They can.")
[5] Defense counsel submitted an exhibit that purported to contain a compilation of the emails that he sent or received from USPO Christopher. (DEX 1.) They notably omitted these three emails. (GEX 28, 29 and 30.)

There is probable cause to believe that the defendant falsely stated under the penalty of perjury that        stole the defendant's 2021 Cadillac Escalade when, in truth, the defendant purchased the car for    all of the documentary evidence shows that   owns the car, and the defendant had a history of giving   things of value. (*See* Mot. at 13; Attachment A; GEX 4, 7, 8, and 9.) The audio and video recordings of the defendant's encounter with   in which the defendant taunts   about going to jail, further support the inference that the defendant's allegations that   stole his car were false and vindictive. (GEX 21, 22.)

In response, the defendant argues that he believed that he owned the car because he paid for it entirely. (Opp. at 14.) That is not how gifts work. The defendant paid for everything he gave to   over the course of their relationship; that does not mean the defendant owned those things.[6]

The defendant also argues that one of   text messages acknowledged that the car was jointly owned by   and the defendant. (Opp. at 14 (citing DEX 3).) Even if true, it would still prove that the defendant lied when he falsely stated that   stole the defendant's car because, in such a case, the car would have belonged to them both.

## B. There Is Probable Cause the Defendant Patronized a Sex Worker

There is also probable cause that the defendant patronized a sex worker – namely   – while on pre-trial release. *See Texas v. Brown*, 460 U.S. 730, 742 (1983) ("probable cause is a flexible, common-sense standard"). Based on the evidence, a reasonable person could easily find that after the defendant concluded his relationship with one sex worker (   he replaced him with another (   – and then used the same fraudulent method of paying him: disguising his payments for sex as corporate expenses. (*Compare* GEX 3 *with* GEX 10; *compare* Attachment A with Attachment B; *see also* GEX 4, 11, 12.)

---

[6] The defendant's claim that "he" paid for the car in its entirety is false. (Opp at 14.) The defendant did not use his personal money to buy the car. Rather, he used corporate funds from the Fortress corporate bank account. (GEX 6.)

Probable cause is further supported by the recorded conversation between the defendant and ▮ which provides further evidence that the defendant has recently paid sex workers for sex and has a *modus operandi* for disguising his payments for sex as corporate expenses. In the audio recording, the defendant admits that ▮ was a sex worker and that he paid him for sex:

Defendant: "You're out there fucking working for $250 an hour fucking blowing people. ..."

▮ "You forget how we met."

Defendant: "Oh no, I know – I don't have a problem with that. I'm just saying it's a low end job. Fucking, you can't do anything else. You told me that. ...

▮ "You certainly were getting me at least once, twice a week."

Defendant: "Yeah. Absolutely. Why not? Why not?"

(GEX 22 at 2.)

Also in the audio recording, the defendant acknowledges that ▮ was not actually an employee of Fortress: "You're so fucking stupid, on your TD Ameritrade, you put down there that you're an employee of Fortress – that's fucking bank fraud right there." (*Id.* at 4.)[7] The defendant's admission confirms that when he paid ▮ from the Fortress account, it was not for work ▮ had done for the company because ▮ did not work there.[8]

In his response, the defendant does not dispute that ▮ is a sex worker. Instead, he nit-picks about ▮ hot.com profile, arguing that the government does not state when it took this screen capture, and pointing out that the profile indicates it is "not active". (Opp. at 16.) The

---

[7] The defendant's recorded statement that he believes lying about ▮ status as a Fortress employee in bank records constitutes "bank fraud" is remarkable. The defendant lied about ▮ status as a Fortress employee at least 26 times when wiring money from Fortress' corporate bank account to ▮ (*See* Attachment A; GEX 4.) Ten of these wires were sent while on pre-trial release, which means the defendant believed he was committing bank fraud at least ten times while on bond. (*Id.*) His repeated willingness to engage in fraudulent conduct demonstrates that he is unable to comply with any conditions.
[8] The defendant's private statement to ▮ directly contradicts his statement under penalty of perjury in the declaration he submitted to this Court. (*Compare* GEX 22 at 4 *with* DEX 1 ¶ 5.)

7

screenshot was taken on August 1, 2023. And the fact that the profile was marked "not active" as of that date is consistent with ▮ beginning to receive regular payments from the defendant beginning months earlier. (Attachment B; GEX 12.) Indeed, ▮ had a substantially similar profile on rentmasseur.com, which indicates that, while he was active in 2023, he had temporarily frozen his membership and was "last seen" on May 30 (*i.e.*, which was around the time the defendant sent his first payment to ▮ and the date on which the defendant paid for ▮ to get a tattoo in Miami Beach). (GEX 12, 23, 31.)

The defendant attempts to minimize his criminal conduct by pointing out that it is a state misdemeanor charge. (Opp. at 17.) As an initial matter, there is probable cause to believe that the defendant also committed a federal felony when he knowingly transported ▮ between Nevada, Florida and New York to pay him for sex. *See* 18 U.S.C. § 2421. But even if only state misdemeanors, the defendant's crimes are significant and actionable because his conduct is repeated, ongoing, illegal, violative of his Court-ordered conditions, and part of a pattern of total disregard for the law and this Court's orders.[9]

## III.  THE DEFENDANT'S VIOLATIVE AND CRIMINAL CONDUCT ESTABLISHES BY A PREPONDERANCE OF THE EVIDENCE THAT HE IS UNLIKELY TO ABIDE BY ANY CONDITION OF RELEASE

In its moving submission, the government proffered facts that establish by at least a preponderance that the defendant is unlikely to abide by any conditions of release. (Mot. at 14-15.) Specifically, the government proved ample evidence and particularized examples that: (i) the defendant's actions demonstrate his disregard for the law and Court orders; (ii) the defendant has an established pattern of withholding and concealing information; and (iii) that neither his

---

[9] Remarkably the defendant argues that, because he sought and the Court granted him a one-year trial continuance, he should be permitted to remain on pre-trial release despite numerous violations, including his commission of new crimes. (Opp. at 1, 16-17.) The length of time until trial provides no basis to ignore his violative conduct.

indictment nor his conditions of release have deterred the defendant from committing new crimes. (*Id.*) The government has proven by a preponderance of evidence that the defendant cannot be trusted to comply with any condition of release and readily satisfied the standard to revoke bond and detain him. 18 U.S.C. § 3148(b)(2)(B).

In addition, recent developments further prove that the defendant is unsuitable for pre-trial release. *First*, the defendant lied to the Court when he submitted under penalty of perjury a declaration that contains several materially false and misleading statements that are contradicted by, among other things, documentary evidence and statements he made in private. (DEX 2 ¶ 5 (lying about employing ████████ ¶ 6 (lying about his ownership of the car); ¶ 7 (lying about the circumstances surrounding his purported relationship with ████████ ¶ 9 (lying about his communications with USPO Christopher)). *Second*, in recorded calls that the defendant made while in custody, he disparaged USPO Christopher, calling him an "absolute prick" and an "asshole" who wants to "bust his chops" because it is a "busy case", and the defendant hatched a plan to evade USPO Christopher's supervision by moving full time from the Northern District of New York to the Southern District of Florida, where he believes the Probation Office will be more lenient. (GEX 24 at 6, 15, 17, 63.) *Third*, the defendant, who understood that his calls were recorded (*id.* at 35, 37, 42, 46, 70), repeatedly made threats against the government. (*See, e.g., id.* at 47 ("[W]hen I come out, I will fight like a motherfucker and I will fucking beat this fucker down … Get the fuck outta my way."); *id.* at 48 ("[…] so I got the full team there in Miami on the ground and I'm, like, here we go, brothers. Let's fucking go. You want to fucking rumble? Let's fucking go, you fuckers. I'll fucking go.")

Importantly, the defendant does not directly respond to the government's proof that he is unlikely to abide by any conditions. (Opp. at 18-19.) Instead, he argues only that the government

fails to show that he is a danger to the community or a serious flight risk. (*Id.*) The government need not prove that the defendant is dangerous or a flight risk to justify detention; the government need only establish that the defendant is not suitable for pre-trial release.[10] None of the cases on which the defendant relies suggest otherwise.

Regardless, the evidence shows that the defendant poses a danger to the community. The defendant is a serial fraudster who has lied to the FTC, been sued by investors and others for fraud in connection with the latest company with which he is involved (*i.e.*, Vinco Ventures Inc.),[11] repeatedly committed what he understood to be "bank fraud" by lying to his bank about the reason he sent dozens of wire transfers, lied to local law enforcement, lied to his probation officer, and lied to this Court. Were the Court to release the defendant from custody, the evidence shows that he would likely continue to commit new crimes, including fraud.

## CONCLUSION

For the foregoing reasons, the government respectfully requests the Court revoke defendant Theodore Farnsworth's pretrial release and order him detained pending trial.

---

[10] *See, e.g., United States v. Abovyan*, No. 18-80122-CR-Middlebrooks, 2018 U.S. Dist. LEXIS 151578, at *6-7 (S.D. Fla. Aug. 31, 2018) (finding defendant was no longer trustworthy where he claimed his several violations were the result of a misunderstanding, attempted to minimize his violative conduct, and shifted blame to his probation officer); *United States v. Capps*, Civil Action No. 3:20-CR-00008-E, 2020 U.S. Dist. LEXIS 59691, at *16 (N.D. Tex. Apr. 6, 2020) (finding defendant lied to his probation officer about violating his conditions and repeatedly failed to enroll in program that would have permitted probation to supervise his computer usage); *United States v. Davis*, No. 3:17-CR-669-L, 2020 U.S. Dist. LEXIS 24995, at *13 (N.D. Tex. Feb. 13, 2020) (finding defendant attempted to conceal certain conduct from probation after the fact); *United States v. Novoa*, No. 3:16-CR-536-L, 2019 U.S. Dist. LEXIS 35134, at *13 (N.D. Tex. Mar. 5, 2019) (finding defendant attempted to avoid detection by law enforcement by engaging in deceptive conduct).

[11] The defendant also concealed this fact from Probation. The defendant is a named civil defendant in two shareholder derivative suits: *Vick v. Vinco Ventures*, No. A-23-868781-C (Nev. Dist. Ct. April 11, 2023); *Coulibaly v. Vanderbilt*, No. A-23-871337-B (Nev. Dist. Ct. May 25, 2023). The defendant is also a named civil defendant in *Ma v. Vinco Ventures, Inc.*, No. A-23-869011-B (Nev. Dist. Ct. April 20, 2023), which alleges defendant defrauded his former business partners. Finally, the defendant is a named civil defendant in *Ficto Holdings LLC v. Zash Global Media and Entertainment Corp.*, No. 22-STCV-11217 (Cal. Sup. Ct. August 23, 2022), which alleges the defendant engaged in fraud and breach of contract. When asked on July 11, 2023 by USPO Christopher to disclose whether he had any "civil matters in Court pending[,]" the defendant replied "no." (GEX 20.) When asked specifically about a matter in Onondaga County, the defendant acknowledged only that case. This is another example of the defendant's consistent efforts to conceal information from Probation and this Court.

Respectfully submitted,

GLENN S. LEON, CHIEF
U.S. DEPARTMENT OF JUSTICE CRIMINAL
DIVISION, FRAUD SECTION

By:

Christopher Fenton
Lauren Archer
Matthew Reilly
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 320-0539
christopher.fenton@usdoj.gov

## CERTIFICATE OF SERVICE

I, Christopher Fenton, hereby certify that on August 29, 2023, I caused the foregoing to be

filed under seal with the Clerk of Court in person and that I will cause a copy of the filing to be

sent via email to the parties who have entered an appearance in this case.

By:

Christopher Fenton
Trial Attorney
Florida Special Bar Number A5502969 (Fenton)
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 320-0539
Christopher.Fenton@usdoj.gov