**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| UNITED STATES OF AMERICA.<br><br>v.<br><br>THEODORE FARNSWORTH and J. MITCHELL LOWE,<br><br>Defendants. | Case No. 22-CR-20521-RNS |

**DEFENDANT THEODORE FARNSWORTH'S OPPOSITION TO THE
GOVERNMENT'S MOTION TO REVOKE PRE-TRIAL RELEASE**

Defendant Theodore Farnsworth respectfully submits this memorandum in opposition to the Government's motion to revoke Mr. Farnsworth's pre-trial release and to detain Mr. Farnsworth pending his trial next September (the "Motion"). Farnsworth respectfully submits the alleged violations set forth in the Motion are either without merit or were committed unintentionally, and taken alone or together, do not merit pre-trial detention for the next year. There is no plausible argument that these events render Mr. Farnsworth a flight risk, and while we acknowledge some of Mr. Farnsworth's decisions were poor, they do not provide a basis to conclude that he is a danger to his community or cannot abide by conditions entered by the Court. In sum, Mr. Farnsworth is not within the "'limited group of offenders' [who] should be denied bail pending trial." *See United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 7, *reprinted in* 1984 U.S.C. Cong. & Ad. News 3182, 3189). To that end, Mr. Farnsworth is ready and willing to abide by any additional conditions the Court deems appropriate to impose.

1

I.  **Relevant Background**

A.  **Mr. Farnsworth's Court Imposed Bail Conditions.**

At this case's outset, the Government and Mr. Farnsworth agreed he could freely travel between his two homes—the Northern District of New York and the Southern District of Florida. After he was indicted, Mr. Farnsworth appeared before Magistrate Judge Damian in this District on November 17, 2022. A review of the order imposing the bail conditions (the "Bail Order," ECF No. 13) and the transcript of the bail hearing make clear that Mr. Farnsworth was permitted to travel between the Southern District of Florida and the Northern District of New York without any conditions or pre-authorization.[1] A review of the transcript further corroborates that the purpose-driven conditions for travel were limited to the Washington, D.C. area and the Southern District of New York, and that travel to those districts also did not require pre-approval by Probation.[2] All other travel "within the domestic United States can be approved by Pretrial Services without the need for further relief from the Court." *Id.* at 10. Judge Damian asked the Government whether Mr. Farnsworth's counsel accurately identified the conditions, and the Government responded, "Yes, Your Honor, that's accurate." *Id.* at 11. And Judge Damian said all the agreed-upon terms were "agreeable to the Court as long as they're agreeable to Pretrial Services." *Id.* at 13. No objection was made by Pretrial Services.

That agreement was memorialized in the Bail Order entered by the Court. *See* ECF No. 13. As a special condition of bond, the Bail Order provides: "The defendant may travel to the Southern

---

[1] *See* ECF No. 62 (Transcript of Nov. 17, 2022 Hearing) at 9 (Mr. Farnsworth's "travel was limited between the Northern District of New York where Farnsworth . . . generally resides in the Syracuse area, and here in the Southern District of Florida . . . and travel in between.").

[2] *Id.* at 9–10 (Mr. Farnsworth's counsel represented that "in addition to the Northern District of New York and the Southern District of Florida," the parties agreed Mr. "Farnsworth can also travel to the Southern District of New York for business purposes" and "to the DC metropolitan area to meet with his counsel for purposes of preparing for this case.").

2

District [of] Florida, [t]he Northern District of New York, the Southern District of New for purposes of conducting business, and the District of Columbia metropolitan area for purposes of meeting with counsel." *Id.* at 7. In addition, for travel *anywhere else* in the United States, the Bail Order stated: "The defendant may travel throughout the United States as authorized by Pretrial Services in advance of any such travel, but without further leave of Court." *Id.*

Another condition for his release was that Mr. Farnsworth "[m]ust not violate any federal, state or local law while on release in this case. Should the defendant come in contact with law enforcement he/she shall notify the U.S. Probation Officer within 72 hours." *Id.*

### B.  Mr. Farnsworth Abided by the Travel Provisions of the Bail Order.

Since November 2022, Mr. Farnsworth has diligently complied with the Court's restrictions on travel. Aside from his trips to Districts allowed under the Bail Order *without* pre-approval by Probation, such as when he visited the Southern District of Florida and the District of Columbia to meet with his attorneys, Mr. Farnsworth requested permission from his local Probation Officer in the Northern District of New York (the "Probation Officer") for travel and documented his travel. Those visits included several trips to Greenville, South Carolina so Mr. Farnsworth could see his dying mother and to Tampa Bay, Florida for a dental-related emergency. *See* Ex. 1 (Emails between Mr. Farnsworth and his Probation Officer) at 4–49 & 81–111 (Greenville visit); 51–80 (Tampa visit). Mr. Farnsworth also complied when the Probation Officer denied requests for travel to other districts. For example, on one occasion, Mr. Farnsworth requested to visit Los Angeles, California for business; the Probation Officer denied the request, so Mr. Farnsworth did not travel to Los Angeles. *See* Ex. 1 at 112–118. The Government has not alleged Mr. Farnsworth ignored the Probation Officer or went anywhere else other than the Southern District of Florida. *See* Motion at 7 (recounting the Probation Officer's virtual meeting with Mr. Farnsworth while he was in Miami).

3

On July 10, the Probation Officer visited Mr. Farnsworth's home in the Northern District of New York while Mr. Farnsworth was in the Southern District of Florida. *See* Ex. 1 at 120. Afterward, the Probation Officer told Mr. Farnsworth he must notify him whenever Mr. Farnsworth planned *any* trip. *See* Ex. 1 at 124. Mr. Farnsworth responded, "I apologize for that. I didn't realize I had to check in on the Miami location. . . . I have not traveled outside of the New York district or the south Florida district[.] I do apologize once again." *See* Ex. 1 at 127. In that same conversation, the Probation Officer asked why Mr. Farnsworth disclosed his trip to Tampa Bay for dental work while not disclosing his trip to Miami. Ex. 2 (Declaration of Ted Farnsworth) at ¶ 8. Mr. Farnsworth relayed Tampa was not in the Southern District of Florida, which is why he had requested special permission to visit there. *See id.*

### C. Farnsworth's Relationships with Two Individuals, ███████████.

Mr. Farnsworth is openly gay and has a long-time life partner, ███████ Mr. Farnsworth has also had other personal relationships of a romantic nature over the years. Two of those people—███████████████████████—are featured prominently in the Motion. Mr. Farnsworth's interactions with ██ and ███, which the Government argues is a basis to revoke Mr. Farnsworth's bail, are far from the black-and-white pictures the Government paints in its brief.

#### 1. ███████

██ is Mr. Farnsworth's ex-boyfriend who previously lived with him in New York; they were in a relationship for roughly five years. Gov't Ex. 1 at 12. While living together, ██ also provided part-time work for one of Mr. Farnsworth's business ventures and, more generally, helped Mr. Farnsworth complete errands and other tasks. Ex. 2 at ¶ 5. Mr. Farnsworth does not deny that during their relationship, Mr. Farnsworth frequently wired money to ██. *See generally*

4

Gov't Ex. 4. There is nothing unlawful or inappropriate regarding Mr. Farnsworth sending money to a romantic partner. And some of the funds from those payments were used to pay household expenses such as electric bills, cable bills, and lawn care.

In 2021, Mr. Farnsworth purchased a Cadillac Escalade. Mr. Farnsworth alone paid for the vehicle, through a privately held company he controls, Fortress Entertainment Group Inc. ("Fortress"). *See* Gov't Ex. 6. By ▇ own admission, in February 2022, he understood the vehicle did not belong to him. *See* Ex. 3 (Text from ▇ to Mr. Farnsworth's associate) ("Ted is gonna buy ▇ an escalade for a closing gift[.] Ted has never gotten me anything near that. *Our new escalade is in both our names bc he doesn't trust me*. . . . Ted thinks if he would leave that in my name that I would take off. . . . Idk we got close to ending it before the weekend.") (emphasis added).³

A series of events in April and May 2023 resulted in Mr. Farnsworth ending his relationship with ▇. On April 12, while meeting with his attorneys in Washington, D.C., Mr. Farnsworth received a notification that one of his other vehicles was traveling 140mph on Interstate 690 near Baldwinsville, New York. Gov't Ex. 1 at 12. Farnsworth knew it was ▇, and he called ▇ to tell him to stop driving the car so fast. *Id.* The next day, on April 13, ▇ and Mr. Farnsworth began to argue, and ▇ lunged at Mr. Farnsworth and grabbed his throat—Mr. Farnsworth almost passed out. *Id.* ▇ later admitted to choking Mr. Farnsworth and said he "use[d] [his] strength to get [Mr. Farnsworth] of [sic]" him. Gov't Ex. 2 at 12. Contemporaneous photos demonstrate the extensive injuries ▇ inflicted upon Mr. Farnsworth. *See generally* Ex. 4 (photos of Mr. Farnsworth's injuries).

---

³ ▇ is another individual, not ▇. And this message was obtained directly from Mr. Farnsworth's associate.

Over the next few weeks, Mr. Farnsworth learned ▌ had taken steps to steal the Cadillac Escalade and other personal items. Mr. Farnsworth noticed his Escalade's insurance information was in ▌ name only, and he could not find the title or registration to the vehicle. Gov't Ex. 2 at 13. He also noticed a gold chain and two Rolex watches had been stolen, and he received a notification from the Escalade's tracker that ▌ had taken the vehicle. *Id.* Mr. Farnsworth also learned that ▌ had registered and titled the Escalade solely in his name. Ex. 2 at ¶ 6.

A few weeks after he was attacked, Mr. Farnsworth contacted the police to report the altercation and property theft. Mr. Farnsworth was never arrested or charged with any crime by law enforcement authorities with respect to issues relating to ▌ As set forth in more detail below, Mr. Farnsworth readily acknowledges that he did not alert the Probation Officer when he initiated contact with the police on these issues. Ultimately, Mr. Farnsworth obtained a restraining order against ▌ because of his attack on Mr. Farnsworth. Gov't Ex. 2 at 13.

Despite the restraining order against him, ▌ has attempted to contact Mr. Farnsworth several times through alternate means after Mr. Farnsworth blocked all methods of communication with ▌ On July 21, ▌ contacted one of Mr. Farnsworth's associates, expressing "I hope Ted knows I love him forever and ever[.] [H]e's my butterscotch." Ex. 5 (Text from ▌ to Mr. Farnsworth's associate) at 1. On Saturday, August 5, ▌ again contacted the same associate, saying he was "so worried" and asking for ▌'s number to try to "help on how to stop th[is]." *Id.* Additionally, according to messages posted on X (formerly Twitter) by a third party, ▌ indicated his reason for seeking a restraining order against Mr. Farnsworth was because Mr. Farnsworth got one against him. Ex. 6 (Messages between ▌ and a third party posted to social media) at 2 ("Wym he got a restraing [sic] order issued on me and I was pissed so I got one on

him."). ▓ also admitted his restraining order against Mr. Farnsworth lapsed because ▓ did not want to go to court since "[t]he family court judge was a [expletive]." *Id.* at 4.

2. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

More recently, Mr. Farnsworth has had a romantic relationship with ▓▓▓ ▓▓▓▓▓▓. As ▓ and Farnsworth's relationship fell apart, Mr. Farnsworth began to see ▓▓▓. *See* Motion at 6; Gov't Ex. 1. Indeed, Mr. Farnsworth's cell phone records indicate he called or received a call from ▓▓▓ nineteen times since May 18, 2023, when the Government claims they met. Gov't Ex. 11; Motion at 6. In fact, they met in 2022, before Mr. Farnsworth was indicted. Ex. 2 at ¶ 7. Mr. Farnsworth plans to start a jewelry line with ▓▓▓, and ▓▓▓ recently went with Mr. Farnsworth to his mother's funeral. *Id.* As with ▓ Mr. Farnsworth acted as a financial benefactor for ▓▓▓.

### D. Mr. Farnsworth is Arrested Shortly After His Mother's Death and the Government Later Moves to Revoke His Release.

Based on an alleged violation of the Bail Order relating to travel authorization, the Court issued a warrant for Mr. Farnsworth's arrest, and he was arrested on August 2 in the Northern District of New York. At the time, he was in his mother's home with his sister, attending to his mother's affairs after her recent death.

The only actual basis for the alleged violation was that Mr. Farnsworth failed to tell his Probation Officer that he was going to the Southern District of Florida. (PTS Violation Memo at 2; Petition for Action on Conditions of Pretrial Release, ECF No. 57). However, the Violation Memorandum also alleges Mr. Farnsworth's Probation Officer questioned Mr. Farnsworth about contact with law enforcement relating to ▓ and alleges Mr. Farnsworth told the Probation Officer that he had reported that contact. *Id.* Mr. Farnsworth does not recall the conversation in the same manner—he remembers explaining he did not think he needed to contact his Probation

Officer because the interaction with law enforcement consisted of Mr. Farnsworth contacting the police to report a crime, rather than Mr. Farnsworth's being contacted or arrested for an alleged criminal violation by Mr. Farnsworth. Ex. 2 at ¶ 9. This explanation of events is more consistent with common sense, as it would have been entirely detrimental to Mr. Farnsworth's own self-interest to lie to the Probation Officer about something that Probation Officer himself could easily confirm or rebut. We do not discount that the Probation Officer may have a different recollection of the interaction. However, we are not aware of any recording of this interaction and respectfully submit that this exchange is ultimately more reflective of confusion or a lack of clarity in what Mr. Farnsworth was saying, as opposed to a clearly demonstrable misstatement to the very person that could confirm or deny its veracity.

After he was arrested, the Court granted Mr. Farnsworth's motion to modify his arrest warrant so he could attend his mother's funeral. ECF No. 63. Mr. Farnsworth was released on the morning of August 7 in New York and was allowed to self-surrender in either New York or Miami by August 9 at 3:00 p.m. *Id.* Mr. Farnsworth followed the Court's order and self-surrendered in the Southern District of Florida. ECF No. 72 (noting appearance in this District after surrender).

The Government filed this Motion on August 8.

## II.     Legal Standard

Motions to revoke a defendant's release are governed by 18 U.S.C. § 3148. District courts should ordinarily deny motions for revocation unless the Government demonstrates either (1) "probable cause to believe that the person has committed a Federal, State, or local crime while on release"; or (2) "clear and convincing evidence that the person has violated any other condition of release." *Id.* § 3148(b)(1). *Even then*, courts should deny the Government's motion unless the court determines: (1) based on the § 3142(g) factors, "there is no condition or combination of

8

conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community"; or (2) "the person is unlikely to abide by any condition or combination of conditions of release." *Id.* § 3148(b)(2). Because the Government does not claim Mr. Farnsworth committed a felony, *see id.* § 3148(b) (burden shifts to defendant only when there is probable cause a defendant committed a felony), it bears the burden of proving the absence of such conditions. *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987); *see also United States v. Salerno*, 481 U.S. 739, 750 (1987) (For detention motions, "the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." (citing 18 U.S.C. § 3142(f)).

"[O]nly a 'limited group of offenders' [] should be denied bail pending trial." *Shakur*, 817 F.2d at 195 (citation omitted); *see also United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Congress's clear intent [is] that only a limited number of defendants be subject to pretrial detention."); S. Rep. No. 225, 98th Cong., 2d Sess. 7, *reprinted in* 1984 U.S.C. Cong. & Ad. News 3182, 3188–89 (courts should imprison only the "small but identifiable group of *particularly dangerous*" defendants "who pose an *especially* grave risk to the safety of the community" and who demonstrate "a *strong probability* . . . of commit[ting] additional crimes if released" (emphasis added)); *cf. Salerno*, 481 U.S. at 747 ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.").

District courts consider the same factors at the revocation stage as they do when initially determining whether a defendant should be released: (1) the nature and circumstances of the charged offense, including whether it involves violence or a minor victim; (2) "the weight of the evidence against" the defendant; (3) the defendant's history and characteristics; and (4) the nature

9

and seriousness of any danger to any person or the community posed by the defendant's release. 18 U.S.C. §§ 3142(g), 3148(b)(2)(A).

### III. Argument

#### A. Mr. Farnsworth Did Not Violate Any Travel-Related Bail Conditions Imposed by the Court.

Mr. Farnsworth did not violate any travel-related bail condition imposed by the Court. The only times he did not notify his Probation Officer about his travel were when he traveled to Districts to which he was expressly authorized to travel without pre-approval, including the Southern District of Florida and the District of Columbia to meet with his attorneys.

Mr. Farnsworth's Court-imposed conditions as reflected in the Bail Order are clear. He can travel to four locations without requesting permission: the Southern District of Florida and the Northern District of New York for any purpose, the Southern District of New York for business purposes, and the District of Columbia metropolitan area for purposes of meeting with his counsel. ECF No. 13 at 7. In other words, the conditions allow Mr. Farnsworth to freely travel between his home in Miami, Florida and his home in upstate New York while allowing him to visit the District of Columbia and the Southern District of New York for certain purposes. All other travel must be preapproved by his Probation Officer. *Id.* The Government agreed to these conditions and told the Court it did on the record. ECF No. 62 (Transcript of Nov. 17, 2022 Hearing) at 13.

Given all parties understood his bail conditions allowed him to travel to the Southern District of Florida freely, there was no violation of any condition, much less clear and convincing evidence of a violation. *See* 18 U.S.C. § 3148(b)(1)(B). The Court should, therefore, deny the Government's motion based on an alleged violation of Mr. Farnsworth's travel conditions.

The Government also argues Mr. Farnsworth violated some non-judicially imposed, un-memorialized condition because he did not provide information about the purpose of his recent

10

Miami trip to his Probation Officer. We need not litigate what additional conditions were purportedly imposed by the Probation Officer. Whatever they may be, they were not violations of the Court's Bail Order and should not be a basis for revocation of pre-trial release.

### B. Mr. Farnsworth Did Not Intentionally Violate His Conditions Related to Contact with Law Enforcement.

The Government's two alleged violations relating to when Mr. Farnsworth contacted the police regarding ▮ also do not provide a basis to detain Mr. Farnsworth. The Government alleges that (1) Mr. Farnsworth violated the conditions by not contacting his Probation Officer after he contacted the police, and (2) Mr. Farnsworth lied to his Probation Officer about speaking with police. Neither has a sufficient factual basis to meet the standards for holding him in custody pre-trial.

With respect to the first violation, Mr. Farnsworth does not dispute that he did not inform his Probation Officer when he affirmatively reached out to law enforcement to report a crime against him by ▮ In hindsight, the better course of action would have been for Mr. Farnsworth to report the situation with ▮ to his Probation Officer (and to have stayed far away from ▮ as their relationship deteriorated). At the time, however, Mr. Farnsworth reasonably believed his condition was triggered by law enforcement *contacting him* relating to allegations of misconduct *by Mr. Farnsworth*, not Mr. Farnsworth affirmatively reporting an alleged crime committed by someone against him. The text of the Bail Order provides support for Mr. Farnsworth's understanding, regardless of whether it was ultimately correct. In total, the relevant provision of the Bail Order provides: The defendant "[m]ust not violate any federal, state or local law while on release in this case. Should the defendant come in contact with law enforcement he/she shall notify the U.S. Probation Officer within 72 hours." ECF No. 13 at 1 When taken as a whole, the operative condition can be reasonably read to mean that Mr. Farnsworth needed to notify his Probation

11

Officer when he "comes into contact with law enforcement" because of a suspected crime that he committed. *Id.*

This interpretation also has a logical basis buttressed by case law. The reporters have many examples of bail being revoked when a defendant is alleged to have committed a crime and fails to report related law enforcement contact. *See, e.g.*, *United States v. Norris*, No. 2:13-CR-00012-MR-DLH, 2013 WL 5786895, at *2 (W.D.N.C. Oct. 28, 2013) (upholding revocation after defendant was criminally charged for violations of domestic violence protection order and failed to report those charges to probation officer); *United States v. Gibson*, No. 1:09 MJ 48-1, 2009 WL 3241793, at *2 (W.D.N.C. Oct. 1, 2009) (revoking bail when the defendant was arrested for possessing methamphetamine and did not report the arrest). In contrast, we have not located any case in which a defendant's bail was revoked when a defendant himself reached out to law enforcement to report a crime and then did not report that contact. In any event, nothing in this allegation suggests Mr. Farnsworth cannot abide by a condition to report all law enforcement interactions, regardless of their context. If given the opportunity, he will do so going forward.

With respect to the second allegation, that Mr. Farnsworth falsely told his Probation Officer that he had told that same Probation Officer about this law enforcement contact, as previewed above, we respectfully aver that the more credible explanation is a misunderstanding, driven by Mr. Farnsworth's understanding (rightly or wrongly) regarding his requirements with respect to this condition. The Government summarily says, when Mr. Farnsworth was asked about his contact with law enforcement, he "falsely responded that he had reported his contact with law enforcement to the Probation Office" and "[t]he Probation Officer conducted a review of his records and confirmed the defendant had not reported any law enforcement contact." Motion at 5–6. There are no details about when Mr. Farnsworth made this statement, what exactly the Probation

12

Officer asked Mr. Farnsworth, or what exactly Mr. Farnsworth said. There does not appear to be any recording or other independent memorialization (*i.e.*, in an email or text) of the exchange. Again, as previewed, it defies common sense that Mr. Farnsworth chose to lie to the Probation Officer *about what he told the same Probation Officer*. It is far more likely that when asked, Mr. Farnsworth attempted to convey that he believed he abided by the relevant bail condition, based on his understanding that his affirmatively reaching out to the police did not trigger a reporting requirement.

This is consistent with Mr. Farnsworth's recollection. He recalls a conversation touching on this topic with his Probation Officer, apologizing to his Probation Officer, and expressing he believed he had followed the obligations of the Bail Order. Ex. 2 at ¶ 9. He recalls saying he did not realize he had to tell his Probation Officer when he affirmatively reached out to police about a crime committed against him. *Id.* Mr. Farnsworth recalled saying he would have shared that information if he had understood his bail conditions required it. *Id.*

### C. Mr. Farnsworth Did Not Violate Any State Law.

#### 1. Mr. Farnsworth Did Not Make a False Statement in His Affidavit, Much Less a Knowingly False One.

The Government alleges there is probable cause Mr. Farnsworth violated New York Penal Code § 210.45 by making a false statement to law enforcement—that ▉ stole Mr. Farnsworth's 2021 Cadillac Escalade when Mr. Farnsworth had gifted it to ▉ Motion at 13. But no probable cause exists because Mr. Farnsworth believed, and still believes, ▉ unlawfully took possession of the Escalade.

Section 210.45 criminalizes making knowingly false statements to law enforcement as a misdemeanor. Its elements are: (1) the defendant made a false statement he did not believe to be true; (2) he did so in a written instrument bearing a legally authorized form notice to the effect that

13

false statements made therein are punishable; and (3) the defendant did so knowingly. *People v. Wagner*, 75 N.Y.S.3d 851, 853 (N.Y. City Ct. 2018) (citing Penal Code § 210.45).

Here, Mr. Farnsworth did not make any knowingly false statement that he did not believe to be true. He reported to law enforcement that his Escalade was stolen and clearly laid out the facts regarding his understanding for how he came to believe ▇ unlawfully took the Escalade. Gov't Ex. 1 at 13 (relaying Mr. Farnsworth realized the insurance paperwork for the Escalade "was address[ed] to ▇ even though the vehicle belonged to me" and his belief that ▇ was traveling Las Vegas to take the vehicle). To this day, Mr. Farnsworth believes ▇ stole the Escalade—he went so far as to have hired attorneys in Syracuse, New York to examine possible claims against ▇ Ex. 2 at ¶ 6. And his belief is rational—Mr. Farnsworth paid for the vehicle entirely, *see* Gov't Ex. 6 (showing that the wire was "on behalf of Ted Farnsworth 2021 Cadillac Escalade"), and he recalled it being clear between him and ▇ that the Escalade ultimately belonged to him. ▇ admitted he understood in February 2022 that the car did not belong to him alone. *See* Ex. 3 ("Ted is gonna buy ▇ an escalade for a closing gift[.] Ted has never gotten me anything near that. *Our new escalade is in both our names bc he doesn't trust me*. . . . Ted thinks if he would leave that in my name that I would take off.") (emphasis added).

The evidence presented by the Government does not contradict Mr. Farnsworth's memory. Mr. Farnsworth does not contest the fact that ▇ name was on the vehicle's registration, as ▇ picked up the vehicle for him back in 2021. That is why a temporary license was issued to ▇ *See* Gov't Ex. 7. And the New York registration listing only ▇ was issued on May 10, 2022, *after* ▇ admitted knowing that Mr. Farnsworth owned the vehicle too. *See* Gov't Ex. 8. That might have been around the time when ▇ covertly converted the vehicle to steal it from Mr. Farnsworth as well—Mr. Farnsworth does not know. In any event, Mr. Farnsworth believed,

14

and still believes, the Escalade is his, so there is no basis to find probable cause he violated Section 210.45.

Mr. Farnsworth's conduct falls far short of what is required to find probable cause he violated Section 210.45. For example, in *People v. Krebbecks*, a New York appeals court upheld the conviction of a defendant who filed a false report claiming someone had used his debit card without his permission and made several withdrawals when photographic evidence established the defendant was the one who made the withdrawals. 32 N.Y.S.3d 411, 412 (N.Y. App. Div., 4th Dep., 2016). In *People v. Twine*, a New York trial court said a person who knowingly misstated the location where a crime occurred violated Section 210.45. 468 N.Y.S.2d 559, 563 (N.Y. Crim. Ct. 1983). Mr. Farnsworth's conduct differs from these scenarios because in each case, the evidence was indisputable that the defendant had lied. Here, by contrast, Farnsworth had an objective basis to believe the Escalade belonged to him, so probable cause does not exist.

While Mr. Farnsworth and ▮ likely have very different views on this property issue, the documentary record establishes Mr. Farnsworth had a credible basis to make the allegations he made to law enforcement.

**2.  Mr. Farnsworth Did Not Violate Penal Code Section 230.04.**

The Government claims there is probable cause that Mr. Farnsworth committed the crime of patronizing a prostitute under N.Y. Penal Code § 230.04, a Class A misdemeanor. Under New York law, to patronize a prostitute means to "solicit[] or request[] another person to engage in sexual conduct with him or her in return for a fee." *Metwally v. City of New York*, 187 N.Y.S.3d 719, 723 (2023). In support of this claim, the Government offers (1) ▮ advertised on an escort/dating service on some unknown date; (2) Mr. Farnsworth contacted ▮ on a phone number that also was in his advertisement; and (3) Mr. Farnsworth sent ▮ money. *See* Motion at 6.

15

The Government's simplistic view of Mr. Farnsworth's having a purely commercial—money-for-sex—relationship with ▆▆▆ is belied by the facts and, stepping back, is a deeply problematic basis to keep Mr. Farnsworth in jail for the next year. Simply because ▆▆▆ offered services at some point through Hot.com does not reductively mean that Mr. Farnsworth's relationship with ▆▆▆ is as back-and-white as the Government claims. Indeed, by way of example, the Government does not provide any information about the date of ▆▆▆ Hot.com advertisement, when the Government took this screen capture, or any other details to verify the relevant date of that advertisement. Gov't Ex. 10. In fact, the Government's capture of ▆▆▆ advertisement indicates it is "not active," and it is not clear when the advertisement was. *Id.* There is nothing in the Government's evidence indicating this advertisement relates to a time when Mr. Farnsworth was on bond or that Mr. Farnsworth reached out to ▆▆▆ through the advertisement.

Next, the Government suggests that Mr. Farnsworth calling ▆▆▆ at the number in the advertisement holds some significance, *see* Motion at 6, yet the Government has offered no reason to believe this is some special phone number existing only for ▆▆▆ alleged Hot.com clients. The advertisement also does not provide any information that ▆▆▆ visited Miami this year, and the dates listed—May 7 to May 12 of whatever year—do not correspond to the calls between ▆▆▆ and Mr. Farnsworth. *See* Gov't Exs. 10–11. Those calls between ▆▆▆ and Mr. Farnworth spanned May 18 to June 25, when his Hot.com advertisement suggests they were *not* in the same location. Gov't Ex. 11. That Mr. Farnworth called ▆▆▆ on these dates, on ▆▆▆ phone number, is not evidence that Mr. Farnsworth was patronizing a prostitute.

Mr. Farnsworth and ▆▆▆ were engaged in a romantic interaction beyond a money-for-sex-act exchange, and the government has no evidence to establish otherwise. Relatedly, the

16

payments to ▓▓▓▓ are consistent with Mr. Farnsworth's payments to his romantic partners, including, as set forth above, ▓▓ *Compare* Gov't Ex. 4, *with* Gov't Ex. 12.

While the exact contours of Mr. Farnsworth relationships with ▓▓ and ▓▓▓▓ may not be customary, this Court should deny revoking Mr. Farnsworth's release based on speculations about his personal relationships. This is especially so for alleged violations of a misdemeanor solicitation provision. Even assuming the Government could have established such a violation (and it has not), rescinding someone's liberty for such conduct for a year is draconian and untethered to the intent of the Bail Reform Act.[4]

### D. Mr. Farnsworth's FTC Report Is Irrelevant to his Bail Conditions.

The Government also alleges Mr. Farnsworth failed to provide a physical address, an email address, and a personal website in an FTC compliance report and that he did not update the FTC regarding his business activities. *See* Motion at 7–9. These allegations are entirely irrelevant to whether Mr. Farnsworth committed a federal, state, or local crime or whether there is clear and convincing evidence he violated any condition of release, so they are immaterial to whether his release should be revoked. *See* 18 U.S.C. § 3148(b)(1). The Government admits as much. *See* Motion at 8 n.4 (Mr. Farnsworth's statements to the FTC "cannot constitute a violation of his conditions of release."). Upon release, Mr. Farnsworth will confer with his counsel with respect to that matter to discuss any updates, as needed.

---

[4] Indeed, at the federal level, as publicly reported, it has long been the policy of the Department of Justice in the context of federal prostitution crimes such as the Mann Act, that "johns" will not be prosecuted. *See* Danny Hakinm & William K. Rashbaum, *Spitzer Is Linked to Prostitution Ring*, New York Times (Mar. 10, 2008), *located at* https://www.nytimes.com/2008/03/10/nyregion/10cnd-spitzer.html (in discussing the Eliot Spitzer case, noting: "Federal prosecutors rarely charge clients in prostitution cases . . . .").

17

### E.     The Bail Reform Act Supports Continued Release.

At a minimum, the Government has failed to establish that "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community" or that Mr. Farnsworth "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2). Few defendants meet this high bar, which is what Congress intended. *See Tortora*, 922 F.2d at 884 ("Congress's clear intent [is] that only a limited number of defendants be subject to pretrial detention."); *see also Salerno*, 481 U.S. at 747 ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.").

Pretrial detention must not be punitive and must serve a regulatory purpose, such as preventing danger to the community or ensuring the defendant is present at trial. *See United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012), *as amended* (Oct. 9, 2012). The key inquiry is whether the person is likely to either fail to appear or act as a danger to the community—courts cannot impermissibly make a preliminary determination of guilt. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (citing *United States v. Alston*, 420 F.2d 176, 179–80 (D.C. Cir. 1969)).

Mr. Farnsworth should remain on release because he is neither a threat to a community nor is there any risk he will flee. As set forth herein, the Government's allegations are unsupported or weak. Mr. Farnsworth, who voluntarily surrendered after his recent arrest, maintains strong family ties both in the Northern District of New York and the Southern District of Florida. He has no criminal history or history of drug or alcohol abuse; and has appeared at every court proceeding when required. Finally, Mr. Farnsworth does not impose a danger to any specific person or to the community at large. *See* 18 U.S.C. § 3142(g).

It is also important to note what is absent from the Government's allegations. *First*, there are no allegations Mr. Farnsworth has ever attempted to flee. When the Court allowed Mr.

18

Farnsworth to attend his mother's funeral and burial, he reported to the Southern District of Florida from the Northern District of New York after being granted 48 hours of release. *Second*, there are no allegations he abused any drugs or unlawfully possessed a firearm. *Third*, there are no allegations he traveled anywhere in the United States without authorization outside of what was expressly approved by the Bail Order, or that he attempted to hide any travel from his Probation Officer when confronted.

### IV.  Conclusion

The Court should deny the Government's Motion.

DATED: August 22, 2023

Respectfully submitted,

> /s/ Henry P. Bell
> BELL ROSQUETE REYES ESTEBAN, PLLC
> 999 Ponce de Leon Boulevard
> Suite 810
> Coral Gables, Florida 33134
> Telephone: (305) 570-1610
> Email: hbell@brresq.com
>
> George James Terwilliger, III (*pro hac vice*)
> Jason H. Cowley (*pro hac vice*)
> MCGUIREWOODS LLP
> 1251 6th Ave., 20th Floor
> New York, NY 10020
> Telephone: (212) 548-2138
> Email: gterwilliger@ mcguirewoods.com
>        jcowley@mcguirewoods.com
>
> *Admitted Pro Hac Vice*
>
> *Counsel for Mr. Theodore J. Farnsworth*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 22, 2023 a copy of the foregoing was filed with the Clerk of Court and served upon counsel for the United States via email at matthew.reilly2@us.doj.gov; christopher.fenton@usdoj.gov; Lauren.Archer2@usdoj.gov.

/s/ *Henry P. Bell*
Henry P. Bell
Fla. Bar No. 090689