

FILED BY _____ TS _____ D.C.

Dec 23, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 22-20521-CR-LEIBOWITZ(s)**
15 U.S.C. § 78j(b)
15 U.S.C. § 78ff
17 C.F.R. § 240.10b-5
18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

v.

THEODORE FARNSWORTH,

Defendant

_____/

**SUPERSEDING INFORMATION**

The United States Attorney charges:

**GENERAL ALLEGATIONS**

At various times material to this Superseding Information:

***Entities and Individuals***

1.     Helios & Matheson Analytics Inc. ("HMNY") was a publicly traded company with offices in Miami, Florida, and New York, New York.  HMNY's common stock traded on the NASDAQ exchange until in or around February 2019, after which it was delisted from the exchange and began trading "over the counter."  HMNY described its product offerings as "a range of technology platforms focusing on big data, artificial intelligence, business intelligence, social listening, and consumer-centric technology."

2.     MoviePass Inc. ("MoviePass") was a privately held company with offices in New York, New York.  MoviePass offered a subscription service through which subscribers paid a flat

monthly fee in exchange for a certain number of movie tickets per month. To use the service, a subscriber would select a movie, theater, and show time through the MoviePass application on the subscriber's smartphone, and then use a MoviePass-branded debit card that was loaded with the cost of the movie ticket to pay at the selected theater.

3.     Vinco Ventures, Inc. ("Vinco Ventures") was a publicly traded company with offices in Fairport, New York. Vinco's common stock traded on the NASDAQ exchange until in or around October 2023, after which it was delisted from the exchange and traded "over the counter." Vinco Ventures described itself as a selective acquisitions company focused on digital media and content technologies.

4.     ZASH Global Media and Entertainment Corporation ("ZASH") was a privately held company with offices in Miami Beach, Florida.

5.     ZVV Media Partners, LLC ("ZVV") was a joint venture between Vinco Ventures and ZASH that Vinco Ventures and ZASH used to acquire interests in other companies, including Lomotif Private Limited ("Lomotif"), a Singapore-based video-sharing and live streaming social networking platform.

6.     The U.S. Securities and Exchange Commission ("SEC"), is an agency within the executive branch of the federal government responsible for regulating the securities markets, including the issuance, marketing and trading of securities. HMNY and Vinco Ventures securities were regulated by the SEC. Public companies, like HMNY and Vinco Ventures, provide information to the SEC and investors by filing certain SEC Forms, such as the Form 8-K and Form DEF 14A, with the SEC using the agency's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system. EDGAR is a database available to investors and the general public via the Internet.

7.      Defendant **THEODORE FARNSWORTH** was an individual who resided in the Southern District of Florida and the Northern District of New York.  **FARNSWORTH** was the Co-Founder and Chairman of ZASH and a Manager of ZVV, and briefly served as Chief Executive Officer of Vinco Ventures.  Before ZASH, ZVV, and Vinco Ventures, **FARNSWORTH** served as the Chief Executive Officer and Chairman of the Board of Directors of HMNY.  Before HMNY, **FARNSWORTH** served as Chairman of LTS Nutraceuticals Inc. ("LTS"), the Chief Executive Officer of Purple Beverage Co. ("Purple Beverage"), and the Chief Executive Officer of XStream Beverage Network Inc. ("XStream").

8.      J. Mitchell Lowe was an individual who resided in the Southern District of Florida and Puerto Vallarta, Mexico.  Lowe served as the Chief Executive Officer of MoviePass.  Before joining MoviePass, Lowe was a co-founding executive of Netflix and former President of Redbox.

## COUNT 1
### Securities Fraud
### (15 U.S.C. §§ 78j(b); 78ff; 17 C.F.R. §240.10b-5)

1.      The General Allegations section of this Superseding Information is hereby re-alleged and fully incorporated herein by reference.

2.      From at least in or around August 2017, and continuing through at least in or around March 2019, within the Southern District of Florida and elsewhere, the defendant,

**THEODORE FARNSWORTH,**

together with others known and unknown to the United States Attorney, did knowingly and willfully, in connection with the purchase and sale of a security, that is, common stock issued by HMNY, by use of the means and instrumentalities of interstate commerce, and by use of the mails, directly and indirectly, use and employ, and cause others to use and employ, manipulative and

deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was the purpose of the scheme and artifice for the defendant, **FARNSWORTH** and J. Mitchell Lowe, to unjustly enrich themselves and others by: (i) making materially false and misleading representations to investors relating to the businesses and operations of HMNY and MoviePass, including HMNY's and MoviePass's product offerings, technology, and capabilities, in order to artificially increase the price of HMNY common stock and attract new investments; (ii) concealing from investors the true facts; (iii) diverting the proceeds of the scheme and artifice for their personal use and benefit through bonuses and misuse of corporate funds for personal expenses; and (iv) concealing the scheme and artifice from regulators, law enforcement, investors, and the media.

## MANNER AND MEANS OF THE SCHEME AND ARTIFICE

The manner and means by which the defendant sought to accomplish the purpose of the scheme and artifice included, but were not limited to, the following:

4.      To artificially inflate the price of HMNY common stock and increase the volume of HMNY shares traded by attracting new investments, **FARNSWORTH** and Lowe made

materially false and misleading representations about the businesses and operations of HMNY and MoviePass. For example, **FARNSWORTH** and Lowe represented that:

    a. MoviePass's new $9.95 "unlimited" plan was tested, sustainable, and would be profitable or break even on subscription fees alone;

    b. HMNY had technology and capabilities it would use, and was using, to generate revenue by analyzing and monetizing MoviePass's subscriber data;

    c. MoviePass also had multiple non-subscription revenue streams that would make MoviePass profitable and even self-sufficient rather than dependent on HMNY for funding; and

    d. MoviePass's cost of goods, as reflected in the number of tickets each subscriber purchased using his or her subscription, was naturally declining over time consistent with **FARNSWORTH's** and Lowe's stated expectations.

5.    All of these representations, which were made to artificially inflate HMNY's stock price and increase the volume of HMNY shares traded by attracting new investors, were materially false and misleading. In truth and in fact, and as **FARNSWORTH** and Lowe knew:

    a. The $9.95 "unlimited" plan was a temporary marketing gimmick to drive subscriber growth, and MoviePass was losing money as a result;

    b. HMNY did not possess the technology or capabilities to generate revenue by analyzing MoviePass's subscriber data and had not integrated any HMNY technology or capabilities into the MoviePass application;

    c. MoviePass did not have non-subscription revenue streams that would make MoviePass self-sufficient or otherwise offset the losses MoviePass experienced as a result of the unprofitable $9.95 "unlimited" plan; and

    d. Behind the scenes, MoviePass was actively preventing subscribers from using the purportedly "unlimited" service for which they had paid because **FARNSWORTH** and Lowe personally directed MoviePass employees to "throttle" subscribers who most frequently used the service to buy movie tickets and then **FARNSWORTH** and Lowe concealed the true nature of their "tactics" from investors and subscribers.

6.    In furtherance of the scheme, **FARNSWORTH** and Lowe made these materially false and misleading representations in press releases, SEC filings, interviews on podcasts and on

television, and in print and online media, all of which were intended to reach, and at times did in fact reach, investors and the general public throughout the United States, including within the Southern District of Florida, and elsewhere. **FARNSWORTH** and Lowe appeared in the media and reviewed and approved the press releases and SEC filings.

### *HMNY's Acquisition of MoviePass*

7.     By 2017, MoviePass was experiencing financial difficulties. MoviePass had been operating at a loss for years and was unable to obtain additional financing. Lowe was on the verge of shutting down MoviePass's business operations when he met **FARNSWORTH**.

8.     On or about August 15, 2017, at the direction of **FARNSWORTH** and Lowe, HMNY issued a press release announcing that HMNY had agreed to acquire a majority ownership interest in MoviePass (the "Acquisition"). HMNY also announced that MoviePass had launched a new nationwide subscription program that enabled new subscribers to see "unlimited" movies in theaters with no blackout dates for a flat monthly fee of $9.95. The strategic rationale for the Acquisition, according to the press release, was to "increase shareholder value" by using HMNY's "big data" and "artificial intelligence" capabilities to monetize MoviePass's subscriber data, including from the new subscribers MoviePass expected to sign up as a result of the $9.95 "unlimited" plan.

9.     As a term of the Acquisition, MoviePass agreed, following the closing of the Acquisition, to apply for listing and seek to begin trading on the NASDAQ or the New York Stock Exchange by March 31, 2018, and HMNY would remain the majority shareholder of MoviePass.

10.     Beginning with the announcement of the Acquisition, **FARNSWORTH** and Lowe launched a campaign to artificially inflate the price of HMNY common stock by publicly promoting materially false and misleading information, as described below. **FARNSWORTH**

and Lowe appeared for numerous interviews on television, and in print and online media, available throughout the United States and elsewhere, including within the Southern District of Florida. For example, **FARNSWORTH** was interviewed by the *Miami Herald* for an article titled "Hollywood Is Being Run Out of Miami." **FARNSWORTH** and Lowe also issued, or caused to be issued, numerous press releases on behalf of HMNY and MoviePass, many of which were disseminated through *Business Wire* via the Internet to media outlets throughout the United States and elsewhere, including within the Southern District of Florida. Many of these interviews and press releases were filed with the SEC on Form DEF 14A and Form 8-K, respectively, and available online via the SEC's EDGAR website.

11.     Following the Acquisition, HMNY raised hundreds of millions of dollars from debt and equity offerings.

12.     **FARNSWORTH**'s compensation was based, in part, on the sale of HMNY securities. In or around mid-December 2017, **FARNSWORTH** negotiated a $1,000,000 bonus for his role in raising capital up to that point. And in or around March 2018, **FARNSWORTH** negotiated a $1,500,000 bonus for his role in completed offerings of HMNY securities totaling $190,000,000 in gross proceeds since mid-December 2017.

13.     **FARNSWORTH's** employment agreement also provided for the payment of multi-million-dollar bonuses based on milestones tied to the stock price of HMNY.

### *The Defendant and Lowe Made Materially False and Misleading Representations About MoviePass's Subscription Model*

14.     In the course of negotiating the Acquisition, **FARNSWORTH** proposed to Lowe that MoviePass slash its price point and offer an "unlimited" plan where, for $9.95 per month, subscribers could see "any movie, any theater, any day." On or about July 6, 2017, Lowe emailed MoviePass executives about **FARNSWORTH's** proposal, which Lowe acknowledged would

cause MoviePass to lose money, writing:

> Ok now for the crazy idea. I would like each of you to tell me why this is a bad idea. I want to change our one and only pricing to $9.95 per month. A movie a day. Try it for Free for either 2 weeks or 1 month. Please no reason to tell me how much money we could lose.

In response to Lowe's email, and at various times thereafter, members of the MoviePass executive team confirmed to **FARNSWORTH** and Lowe that the $9.95 "unlimited" plan was unprofitable and unsustainable.

15.     Believing that HMNY's stock price was tied, in part, to MoviePass's subscriber count, **FARNSWORTH** and Lowe launched the $9.95 "unlimited" plan as a marketing gimmick to attract new subscribers and increase the price of HMNY stock. In response to questions about whether the $9.95 "unlimited" plan was "too good to be true," **FARNSWORTH** and Lowe made materially false and misleading representations that the plan had been tested and was a profitable and sustainable business model, when in fact they knew it had not been tested and was neither profitable nor sustainable.

16.     For example, on or about August 16, 2017, **FARNSWORTH** and Lowe appeared for a joint interview on *Fox Business*, during which they were specifically asked whether MoviePass would lose money on the $9.95 "unlimited" plan. Lowe promoted the materially false narrative that the $9.95 "unlimited" plan would not lose money even though he had privately acknowledged weeks earlier that it was a "crazy idea" that would lose money:

> Lowe: We have figured out a way to give people a deal where they cannot believe we can even afford to give.
>
> Interviewer: Yea, because you lose money.
>
> Lowe: Yea, no, we actually don't. Uh, and.
>
> Interviewer: How do you not lose money?

> Lowe: We have built a system that attracts people - a price point that attracts people that only go three to six times a year.

17.     Lowe's representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, neither HMNY nor MoviePass had tested the $9.95 "unlimited" plan, which had only been proposed for the first time internally weeks before.  **FARNSWORTH** and Lowe also knew Lowe's representations were materially false and misleading because, in reality, **FARNSWORTH** and Lowe knew the $9.95 "unlimited" plan would lose money.

18.     On or about August 16, 2017, Lowe appeared for a print interview for *Variety.com*, which HMNY filed with the SEC on Form DEF 14A, and again promoted the materially false narrative that the $9.95 "unlimited" plan was profitable and sustainable:

> Interviewer: You are operating at a loss and subsidizing the tickets your customers buy. AMC claims that at some point you will have to raise your prices or you'll go out of business. Are they correct?
>
> Lowe: The answer is no. They don't understand our business model.

19.     Lowe's representation was materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, the $9.95 "unlimited" plan was a temporary measure that was unprofitable.

20.     On or about September 22, 2017, **FARNSWORTH** appeared for a print interview with Pipeline Data, LLC ("Pipeline Data"), which HMNY filed with the SEC on Form DEF 14A. **FARNSWORTH** repeated the materially false claims that the $9.95 "unlimited" plan had been tested and proven profitable:

> Interviewer: How is the $9.95 pricing going to work within your business model?
>
> **FARNSWORTH**: MoviePass has been around for five years, so we have a wealth of historical data. At $39, the average customer would go to four movies a month. At $29, the average dropped to three movies a month. When MoviePass went to $19, the average

customer went to two movies a month. So we think we can be profitable on the subscriptions at $9.95 and then make the real money from the additional revenue sources. The size of our customer base will give us a lot of leverage.

Interviewer: So, you think you can break even on the subscriptions alone?

**FARNSWORTH**:  I'm confident that we will. We already see it in our first 30 days at $9.95.  Usage was even lower than we anticipated.

21.     **FARNSWORTH's** representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, no testing had been done on the $9.95 "unlimited" plan and it was a temporary gimmick that was unprofitable.

22.     Within weeks of **FARNSWORTH's** Pipeline Data interview, Lowe privately inquired about changing the $9.95 "unlimited" plan that he publicly claimed was sustainable.  On or about October 6, 2017, Lowe emailed a team of MoviePass executives to request "everyones [sic] feedback on removing theaters who charge above $12 or $13.  Thoughts?"  In response, one MoviePass executive wrote:

> Tricky situation. This creates a few different issues in a few different areas.

> First, it removes a majority of theaters in large markets: NYC, LA, DC, SF, Seattle, Philadelphia. Across only the top 15 major networks it impacts, it affects 50% of our user base.

> \*\*\*

> Then we get into the press/publicity aspect of it. Basically, that would give AMC validation that they were right all along; that this is not a sustainable product and it completely kills any credibility we have left.

23.     **FARNSWORTH** and Lowe continued to make similar materially false and misleading representations about the profitability and sustainability of the $9.95 "unlimited" plan. For example, on or about January 9, 2018, **FARNSWORTH** and Lowe appeared for a joint interview on *Yahoo! Finance*.  When asked during that interview whether $9.95 was "too low of a price point," **FARNSWORTH** falsely responded, "No," while Lowe misleadingly added that

the price point attracted moviegoers who only attended movies five times a year.

24.     In that same interview, Lowe also made the materially false and misleading representation that it was "not true at all" that MoviePass needed movie theaters to agree to provide MoviePass with lower ticket prices to turn a profit (*i.e.*, to reduce the difference between the price MoviePass paid for a move ticket and the amount MoviePass received from monthly subscribers). Lowe knew his representation was materially false and misleading when he made it because, as described in paragraph 23, Lowe had earlier explored the possibility of removing from the subscription service theaters that charged more than $12 or $13 for a movie ticket.

25.     On or about January 16, 2018—one week following the January 9, 2018, joint interview with *Yahoo! Finance*—Lowe texted **FARNSWORTH** and HMNY Executive 1 concerning the losses caused by subscribers' use of the service for which they were paying and to suggest MoviePass terminate the $9.95 "unlimited" plan.

26.     The next day, on or about January 17, 2018, Lowe again texted **FARNSWORTH** about the need to change the $9.95 "unlimited" plan.   In his private communication to **FARNSWORTH**, Lowe acknowledged that the $9.95 "unlimited" plan always had been a temporary measure and that it was not sustainable.

27.     Approximately one week later, on or about January 26, 2018, Lowe appeared for a print interview with *The Hollywood Reporter*, and again promoted the materially false narrative that the $9.95 "unlimited" plan was tested, sustainable, and profitable:

> Interviewer: Is there a point when you'll just not be able to afford more subs [*i.e.*, subscribers] because you're buying them too many tickets?
>
> Lowe: No. I don't know why everybody believes that our customers are watching so many movies. At some point we'll share more data with you and you'll be shocked. …

***

Interviewer: Is there a point where you'll need to raise the price of a sub?

Lowe: We don't need to raise the price. I spent a year studying how I can get people who spend $50 a year going to movies to spend $120 a year, and $9.95 is the price point that gets them into the theaters more often.

28. Lowe's representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, no testing had been done on the $9.95 "unlimited" plan and it was a temporary measure that was unprofitable. Indeed, by the time of this interview, **FARNSWORTH** and Lowe had already agreed privately to abandon the $9.95 "unlimited" plan.

29. On or about February 18, 2018, while appearing on an episode of the *Recode Media* podcast, Lowe again falsely represented that MoviePass "tested like crazy until we were ready to roll out the $9.95 plan." At the time Lowe made this representation, he knew that MoviePass had not tested the $9.95 "unlimited" plan.

30. On or about April 13, 2018, MoviePass announced it was retiring the $9.95 "unlimited" plan. **FARNSWORTH** and Lowe, however, continued to make materially false and misleading representations about MoviePass's subscription plan to artificially inflate the price of HMNY's stock. For example, on or about April 27, 2018, Lowe texted **FARNSWORTH** to suggest MoviePass reintroduce the $9.95 "unlimited" plan to artificially inflate HMNY's stock price and cause investors who speculated that the price of HMNY would decline (commonly referred to as "short sellers" or "shorts") to "panic":

Lowe: We could blow people away if on Wednesday we do Unlimited for $9.95

**FARNSWORTH**: I know

Lowe: We should

**FARNSWORTH**: Change the whole story[.] I agree[.] And just keep throttle ing[.] And not tell anyone

Lowe: The shorts will panic

**FARNSWORTH**: Omg 😲 listen to you!!!! Your [sic] starting to scare me lol

Lowe: Learning

**FARNSWORTH**: Lol

On or about May 2, 2018, fewer than three weeks after it was retired, the $9.95 "unlimited" plan was reintroduced for this fraudulent purpose.

### *The Defendant and Lowe Made Materially False and Misleading Representations About HMNY's Data Analytics Technology and Capabilities*

31.     **FARNSWORTH** and Lowe repeatedly made the materially false claim that the strategic rationale behind HMNY's acquisition of MoviePass was to enable HMNY to leverage its data analytics technology and capabilities to increase shareholder value by monetizing MoviePass's subscriber data.

32.     For example, in HMNY's August 15, 2017, press release, which was disseminated to investors through *Business Wire* and filed with the SEC on Form 8-K, **FARNSWORTH** was quoted as saying: "I believe the technology platforms that Helios and Matheson has built over the years are a perfect fit for the MoviePass family[.]  With our big data and artificial intelligence platforms and other technologies that we own, we will be able to bring a significant technological advantage to MoviePass."

33.     These representations in HMNY's August 15, 2017, press release were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, HMNY did not possess or otherwise "own" the types of technologies described in the press release, including "big data" and "artificial intelligence" platforms or any other technologies capable of monetizing MoviePass's subscriber data.

34.     Following the Acquisition, **FARNSWORTH** and Lowe repeatedly made the materially false claim that HMNY's technologies were being used to analyze MoviePass's subscriber data and integrated into the MoviePass application.  For example, on or about September 14, 2017, HMNY issued a press release that was disseminated to investors and the market online through *Business Wire*, *The Miami Herald* website, and an 8-K filed with the SEC, among other means.  The press release stated:

> Using the Helios and Matheson Analytics resources, MoviePass Inc. analyzes consumer trends, patterns and activities to engage subscribers with movie related merchandise, advertising, and concessions relevant to their MoviePass experiences. Helios and Matheson believes its technology stack combined with the MoviePass business model will transform the movie going experience and create great value for both companies. ... Helios and Matheson's technology learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings. ...

Also in the press release, **FARNSWORTH** was quoted as saying: "This explains our sustainable business model: Helios and Matheson is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts."

35.     These representations in HMNY's September 14, 2017, press release were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, HMNY did not possess the types of technologies described in the press release, HMNY had not used any of its technologies to analyze MoviePass's subscriber data, and HMNY had not integrated any of its technologies into the MoviePass application.

36.     On or about October 24, 2017, HMNY issued a press release that was disseminated to investors and the market online through *Business Wire*, *The Miami Herald* website, and an 8-K filed with the SEC, among other means.  The press release stated:

> Following HMNY's purchase of a majority stake in MoviePass, which remains subject to the approval of HMNY's stockholders, HMNY plans to further integrate its data analytics capabilities with the MoviePass service to analyze moviegoer's behaviors and preferences, with the goal of helping the film industry better understand what audiences want. With HMNY's capabilities, HMNY believes that MoviePass can bridge an intelligence gap for the movie theater industry so the entire film ecosystem can better serve audiences in areas ranging from production to advertising.

In the press release, **FARNSWORTH** was quoted as saying: "When you apply computer science and machine learning to an industry that we believe has lacked significant innovation, useful patterns start to emerge. ... Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors while serving the interests of moviegoers in the process."

37. These representations from HMNY's October 24, 2017, press release were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, HMNY did not possess the types of technologies described in the press release, HMNY had not used any of its technologies to analyze MoviePass's subscriber data, and HMNY had not integrated any of its technologies into the MoviePass application.

38. **FARNSWORTH** and Lowe also repeatedly made the materially false representation that HMNY's technologies were being integrated into the MoviePass application to create a revenue stream based on a "Night at the Movies" concept whereby MoviePass integrated data about subscribers' activities before and after they attended a movie into its business model. For example, on or about October 16, 2017, Lowe appeared for an interview on *Fox Business* during which he explained the "Night of the Movies" initiative:

> Interviewer: And you said that your company MoviePass is planning to make a profit by selling user-data to Uber, Hollywood Studios, restaurants close to the theaters. Basically, bottom line is, you say you're not selling data but you're using the data to inform.

> Lowe: Right. You know, people want to go to the movies more often but they don't want to take the risk of a bad movie. So, what we do at MoviePass is we help them make a better decision as far as enjoying the movie. But going to the movies there's much more to it than just going straight to the movie theater. You go to dinner. You might have drinks. You might

15

use Uber or Lyft. So, we're going to help our subscriber to get to all those businesses and get discount and benefits and –

Interviewer: So, will Uber pay for that information? Do the Hollywood restaurants - I mean, are they paying for that data?

Lowe: They will. As we drive more and more of our subscribers to their businesses we'll take a share of the incremental profit.

Interviewer: And how do you know where people are going after they go to the movies?

Lowe: Well, you know, today with your phone in your pocket, people can track pretty much where you are. You log on to Facebook, they know where you are. When you log in to our app, we know where you are. Because we automate your movie subscription by essentially what theater you're close to.

39.    Lowe's representations were materially false because, in truth and in fact, and **FARNSWORTH** and Lowe both knew, neither HMNY nor MoviePass tracked or collected data on the location of MoviePass subscribers at any point when the MoviePass application was not active for the purpose of searching for a nearby theater or checking into a theater. Moreover, as **FARNSWORTH** and Lowe also knew, HMNY had not used any of its technologies to analyze MoviePass's subscriber data, and HMNY had not integrated any of its technologies into the MoviePass application.

40.    During their January 9, 2018, joint interview on *Yahoo! Finance*, **FARNSWORTH** and Lowe were specifically asked about the source of HMNY's and MoviePass's revenues. **FARNSWORTH** and Lowe promoted the materially false and misleading narrative that HMNY's monetization of MoviePass's subscriber data was driving the companies' revenues:

Interviewer: How are you possibly making money?

**FARNSWORTH**: Sure. Well, I think, people ask us that all the time. And we've known from day one, Helios is a ... analytics company. So when I first got together with Mitch, and we looked at all the data, the analytics, what it was, that's really what made us make the decision to invest in MoviePass.

\* \* \*

Interviewer: Let's work our way through a couple of the short arguments out there.  The idea of selling data is totally overvalued.  There so much data out there, nobody wants to buy it.  You can't monetize the data part."

**FARNSWORTH**: "When we look at the data side, it's a different story … that's where you're making your money, on, on the data, the advertising.

\* \* \*

Interviewer: So, what does Helios & Matheson do? Because we report on the stock all the time, and we joke 'they should just change their name to MoviePass…'

**FARNSWORTH**: …Helios is really a data analytics company, which really made the perfect marriage of MoviePass and the data analytics of how we're driving the revenues of the company right now. …

*41.*    These representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, HMNY did not possess the types of technologies that could be used to monetize MoviePass's subscriber data, HMNY had not used any of its technologies to analyze MoviePass's subscriber data, and HMNY had not integrated any of its technologies into the MoviePass application.

*42.*    **FARNSWORTH** and Lowe also knew these representations were materially false and misleading because, in reality, data analytics were not driving the companies' revenues.  For the fiscal year that ended nine days prior to that interview, MoviePass reported only revenue from subscriptions.   In the first quarter of 2018, MoviePass reported revenues composed overwhelmingly of subscription revenue.   Indeed, after one MoviePass executive notified **FARNSWORTH** and Lowe about closing a deal, he joked that it was in an amount that "Doesn't pay anyone's salary yet."

*43.*    On or about March 2, 2018, Lowe spoke at the Entertainment Finance Forum, giving a speech titled, "Data is the New Oil: How Will MoviePass Monetize It?" Lowe repeated

his materially false claim that MoviePass gathered data about its subscribers by tracking them through their smart phones as part of its "Night at the Movies" initiative.  Lowe falsely stated:

> We get an enormous amount of information. … because you are being tracked in your GPS by the phone, our patent basically turns on and off our payment system by hooking that card to the device ID on your phone, so we watch how you drive from home to the movies. We watch where you go afterwards, and so we know the movies you watch. We know all about you.

After the interview, when it was pointed out that tracking subscribers violated MoviePass's privacy policy, a media backlash ensued.

**44.**   On or about March 7, 2018, one of **FARNSWORTH's** assistants texted **FARNSWORTH** a statement to make to a reporter, which **FARNSWORTH** approved.   The statement, which further supported **FARNSWORTH's** and Lowe's materially false narrative about HMNY's use of data analytics to monetize MoviePass's subscriber data, read as follows:

> It is a mystery to me why so many people are surprised that HMNY (a big data analytics company) and MoviePass are using data to innovate the movie industry. … For months we've been hearing "how does MoviePass plan to make a profit," this is how. The analysis and understanding of consumer behavior is precisely how we are able to deliver a movie a day for $9.95 a month to 2 million subscribers. … What we will do is turn your data into valuable marketplace information so that we and everyone we work with can create the best possible experience for audiences, the studios, and the exhibitors.  That said, Our [sic] members will always have the option to choose the location-based services that are right for them today and in the future.

45.   On or about March 12, 2018, Lowe issued an email apology to MoviePass's subscribers, partners, and employees. Lowe admitted that MoviePass "does not track and has never tracked or collected data on the location of our members at any point when the app is not active," and "does not use and has never used [background tracking capabilities]."  Lowe claimed that he was "joking around" when he stated otherwise.

46.   On or about March 13, 2018, **FARNSWORTH** privately texted Lowe, admitting: "Our stock is tanking on that letter that went out. They're saying the exact thing I was afraid of

that we are not a big data company and we just admitted it in the letter. We got to get you on CNBC start changing the narrative."

47.     Throughout the remainder of 2018, through at least March 2019, **FARNSWORTH** and Lowe continued to promote the materially false narrative that HMNY possessed data analytics technology and capabilities that it was using to monetize MoviePass's subscriber data when, in truth and in fact, and as **FARNSWORTH** and Lowe knew, HMNY did not possess any such technology and capabilities.

***The Defendant and Lowe Made Materially False and Misleading Representations About Non-Subscription Revenue***

48.     In addition to materially misrepresenting that data analytics was a revenue stream for MoviePass, **FARNSWORTH** and Lowe promoted a materially false and misleading narrative about the existence of multiple other non-subscription streams of revenue to help persuade investors that MoviePass could build a sustainable and profitable business.  For example, when asked during the September 22, 2017, interview with Pipeline Data how MoviePass would be profitable with the $9.95 "unlimited" plan, **FARNSWORTH** responded:

> We'll generate revenue from many sources. Tickets, concessions, advertisements… We already have deals in place. We can also sell soundtracks, posters, and other movie-related products, right from their phones. As soon as they're walking out of the theater, we'll contact them. We tested it and 5-8% of people buy product from us.

49.     **FARNSWORTH's** representations in this interview were materially false and misleading.  In truth and in fact, and as **FARNSWORTH** and Lowe both knew, at this point in time, **FARNSWORTH** and Lowe still did not have a plan for how to bridge the gap between the cost of goods associated with the $9.95 "unlimited" plan and achieving profitability.  On or about October 8, 2017, Lowe wrote **FARNSWORTH** and a team of MoviePass executives to ask them to brainstorm "ideas" about how to generate revenue: "So now that we have gotten into month 2

of our new pricing model we will need to create a plan on how we get from the usage level now to the desired profitable model in the future. This will be critical to have well grounded assumptions in order to raise growth capital early in 2018."

50.   During the January 9, 2018, *Yahoo! Finance* joint interview, **FARNSWORTH** falsely stated that, "within the next sixty days, [MoviePass] should be self-sufficient on its own." When asked what revenue streams would make that possible, Lowe misleadingly claimed that there were "Multiple revenue streams. We're signing deals with studios. We're getting discounts from exhibitors."

51.   **FARNSWORTH** and Lowe knew that the claim that MoviePass should be self-sufficient within 60 days was materially false and misleading because, in truth and in fact, around the same time that **FARNSWORTH** and Lowe were publicly claiming that MoviePass was 60 days from being self-sufficient, they were privately discussing in text messages the fact that, every week, MoviePass required millions of dollars from HMNY to survive. As **FARNSWORTH** and Lowe also knew, the few deals that MoviePass had signed could not close the company's multi-million-dollar weekly cash shortfall. And, as discussed in the text message described in paragraph 26 above, **FARNSWORTH** privately acknowledged to Lowe that HMNY was not prepared to cover the growth in costs resulting from the millions of subscribers attracted by the $9.95 "unlimited" plan.

52.   On or about March 23, 2018, HMNY and MoviePass issued a joint press release that was disseminated to investors through *Business Wire* and the *South Florida Business Journal* website, among other means. The press release announced that, for a limited time, MoviePass was offering its annual subscription to new subscribers for $6.95 per month. The press release stated: "MoviePass has gained momentum in diversifying its revenue streams due to a series of

marketing agreements with studios and distributors, as well as partnerships with a number of theater exhibitors. This recent success in forming relationships with studios, exhibitors, and marketing partners has encouraged MoviePass to offer an even more attractive deal to consumers." Also in the press release, Lowe was quoted as saying: "With the current growth and support that we've seen within the last several months, our studio and exhibitor revenues and other marketing partnerships have motivated us to lower the price once again, offering movie lovers greater access to MoviePass."

53.     These representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, **FARNSWORTH's** and Lowe's reason for lowering the price was not MoviePass's ability to generate non-subscription revenue but, rather, its need to receive the full year's subscription payments up front in order to try to ease HMNY's and MoviePass's cash shortfalls. Indeed, as early as January 2018, **FARNSWORTH** and Lowe were texting about their desperate need to access "massive cash" and how an "Annual plan can provide cash flow."

### *The Defendant and Lowe Made Materially False and Misleading Representations About the Nature and Cause of MoviePass Subscribers' Lower Usage Rates and Associated Drop in Cost of Goods*

54.     **FARNSWORTH** and Lowe repeatedly publicly assured investors that, based on historical data, subscriber usage of the $9.95 "unlimited" plan would naturally decline over time as subscribers settled into a predictable, low rate of usage. Their talking points were intended to reconcile for investors how MoviePass's subscriber growth rate could increase at breakneck speed without the company running out of money. As **FARNSWORTH** and Lowe knew, however, this explanation lacked any basis in fact, and subscriber usage did not naturally decline as **FARNSWORTH** and Lowe had falsely claimed it would.

55.     Beginning in or around January 2018, **FARNSWORTH** and Lowe agreed to artificially reduce subscriber usage through behind-the-scenes tactics aimed at reducing the amount of money that MoviePass spent buying movie tickets.  For example, on January 24, 2018, Lowe texted **FARNSWORTH** to discuss which tactics they should use against subscribers:

> Lowe: I need your direction in order to give me time to impact cash flow needs. If we cant [sic] get sufficient funding i can slow down new sub acquisition by reducing card shipments.
>
> **FARNSWORTH**: Ok
>
> ***
>
> Lowe: Ok so we will reduce new card mailings weekly by 60k which will reduce burn starting in 2 weeks by $600k weekly and in 5 weeks exceed $2m lower weekly burn
>
> **FARNSWORTH**: Wow
>
> Lowe: Second we are removing 15 Ame [sic], Regal and Cinemarks that will reduce $500k weekly[.] 3rd we will condtrain [sic] usage of 10 plus ysers [sic] probably saving $500k weekly in next week

56.     In or around April 2018, as MoviePass's cash-flow situation worsened, **FARNSWORTH** and Lowe directed MoviePass employees to reset the passwords of the highest volume users to disrupt or slow their usage of the MoviePass application to buy movie tickets. One MoviePass executive warned Lowe in bolded text that **"there is high risk this would catch the FTC's attention (and the State AG's attention)"** because MoviePass would be "targeting all of our heavy users." Lowe responded, "Ok I get it" and selected the top 2% of the highest volume users for the password reset.  Lowe then reconsidered and selected the 75,000 highest volume users, increasing the percentage of top users who were targeted from 2% to approximately 3.4%. In addition, Lowe also added a requirement that the top 7% of the highest volume users be required to verify their purchases by requiring them to take a picture of the movie ticket they purchased.

Lowe's decision to dramatically expand the number of users who were subject to service disruption prompted one MoviePass executive to write: "lol, project 2% - 7 % - 11% lol."

57.     On or about April 14, 2018, the day after the password reset and ticket verification measures were implemented, Lowe texted **FARNSWORTH** to inform him that they had successfully prevented paying subscribers from buying hundreds of thousands of dollars' worth of tickets. **FARNSWORTH** responded with approval and then sent Lowe a photo of the private jet that he rented using investor money to fly himself and some MoviePass executives to the Coachella Music Festival:

> Lowe: We think the tactics we launched yesterday saved $400k

> **FARNSWORTH**: Oh wow

> Lowe: I was hoping for more. Today will have less impact because within minutes Reddit posted solution to resetting password[.] We did though greatly expand the ticket verification which reduces almost by 1 movie weekly for those in the program

> ***

> **FARNSWORTH**: You would have had a blast on the jet

> ***

> Lowe: Looks like fun.

> ***

> Lowe: I hope you know how much i admire you. Every day i am more proud to be your partner on this mission.

58.     **FARNSWORTH** and Lowe subsequently made materially false and misleading representations reporting that the first quarter reduction in subscriber usage was the result of a maturation of the subscriber base and natural decline over time as subscribers settled into a predictable, low rate of usage. For example, on or about May 16, 2018, HMNY and MoviePass issued a joint press release titled "[HMNY] and MoviePass Report First Quarter Earnings" that

was disseminated to investors through *Business Wire*, the *South Florida Business Journal* website, and an 8-K filed with the SEC, among other means.  The press release announced that HMNY and MoviePass had their "biggest quarter" in their combined history and stated:

> Our core strategy has always been to provide a compelling value proposition to consumers that vastly improves their movie-going experience. As our subscriber base rapidly grows and matures, our financial goal is to breakeven on subscribers and generate alternative revenue streams … Recent trends related to average ticket purchases, churning net growth and reducing abuse has bolstered our confidence in our economic model being viable and shows significant improvement in achieving our objectives. MoviePass is releasing key metrics that demonstrate significant improvements to its economic model and strong appeal to customers. The trendline based on our data suggests this figure will be reduced further in the coming months. As our subscriber base matures, we are also naturally seeing significantly reduced usage over time.

59.    These representations were materially false and misleading because, in truth and in fact, and as **FARNSWORTH** and Lowe both knew, the reduction in subscribers' usage and movie consumption was attributable to a forced reduction in subscriber usage, not a maturation of the subscriber base or natural cycle of use.  These representations were also materially false and misleading because they omitted mention of the fact that, as **FARNSWORTH** and Lowe also knew, MoviePass had selected paying subscribers for involuntary inclusion in programs to prevent or slow use of the service to buy movie tickets based exclusively on the fact that, in the past, these subscribers had used the service the most.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17; and Code of Federal Regulations, Section 240.10b-5.

## COUNT 2
### Conspiracy to Commit Securities Fraud
### (18 U.S.C. § 371)

1.      The General Allegations section of this Superseding Information is hereby re-alleged and fully incorporated herein by reference.

2.      From at least in or around November 2020, and continuing through at least in or around September 2024, within the Southern District of Florida and elsewhere, the defendant,

**THEODORE FARNSWORTH,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with others known and unknown to the United States Attorney, to knowingly and willfully, in connection with the purchase and sale of a security, that is, common stock issued by Vinco Ventures, by use of the means and instrumentalities of interstate commerce, and by use of the mails, directly and indirectly, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

**PURPOSE OF THE CONSPIRACY**

3.      It was the purpose of the conspiracy for the defendant, **FARNSWORTH**, and his coconspirators to unjustly enrich themselves by: (i) making materially false and misleading representations to investors relating to the businesses and operations of Vinco Ventures in order to artificially increase the price of Vinco Ventures common stock and increase the volume of Vinco Ventures shares traded; (ii) concealing from investors the true facts relating to the businesses and operations of Vinco Ventures; (iii) diverting the proceeds of the conspiracy for their personal use and benefit; and (iv) concealing the conspiracy from regulators, law enforcement, investors, and the media.

**MANNER AND MEANS OF THE CONSPIRACY**

The manner and means by which **FARNSWORTH** and his coconspirators sought to accomplish the purpose of the conspiracy included, but were not limited to, the following:

4.      To conceal the true nature of **FARNSWORTH's** role in, and actual control over, Vinco Ventures, **FARNSWORTH** selected individuals to serve as Vinco Ventures' officers and directors with the understanding that those individuals would act at **FARNSWORTH's** direction.

5.      To artificially inflate the price of Vinco Ventures common stock and increase the volume of Vinco Ventures shares traded, **FARNSWORTH** and his coconspirators made materially false and misleading representations about Vinco Ventures' business strategy, business operations, and **FARNSWORTH's** role in transactions.

6.      In furtherance of the conspiracy, **FARNSWORTH** and his coconspirators made these materially false and misleading representations in press releases and SEC filings, all of which were intended to reach, and at times did in fact reach, investors and the general public throughout the United States, including within the Southern District of Florida, and elsewhere.

**FARNSWORTH** and his coconspirators drafted, reviewed and/or approved the press releases and SEC filings.

## OVERT ACT

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one conspirator committed and caused to be committed, in the Southern District of Florida and elsewhere, at least the following overt act, among others:

On or about April 7, 2023, Vinco Ventures filed a Form 10-Q, which was reviewed and approved by **FARNSWORTH** and signed by one of **FARNSWORTH**'s coconspirators. This form was disseminated throughout the United States, including to investors in the Southern District of Florida.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C))

1.      The allegations of this Superseding Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **THEODORE FARNSWORTH**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 371, as alleged in this Superseding Information, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

27

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty.

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c).

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By:

CHRISTOPHER FENTON
LAUREN ARCHER
KATE T. McCARTHY
MATTHEW REILLY
TRIAL ATTORNEYS
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA          CASE NO.: 22-20521-CR-Leibowitz(s)

v.

Theodore Farnsworth                **CERTIFICATE OF TRIAL ATTORNEY**

_____/   **Superseding Case Information:**
                                   New Defendant(s) (Yes or No) __No__
**Court Division** (select one)     Number of New Defendants _____
   ☒Miami  ☐Key West  ☐FTP   Total number of new counts ___1__
   ☐FTL   ☐WPB

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3.  Interpreter: (Yes or No) __No__
    List language and/or dialect: _____
4.  This case will take __0__ days for the parties to try.
5.  Please check appropriate category and type of offense listed below:
    (Check only one)                (Check only one)
    I   ☒ 0 to 5 days          ☐ Petty
    II  ☐ 6 to 10 days         ☐ Minor
    III ☐ 11 to 20 days        ☐ Misdemeanor
    IV ☐ 21 to 60 days         ☒ Felony
    V  ☐ 61 days and over

6.  Has this case been previously filed in this District Court? (Yes or No) __Yes__
    If yes, Judge David S. Leibowitz          Case No. 22-20521-CR-Leibowitz
7.  Has a complaint been filed in this matter? (Yes or No) __No__
    If yes, _____ Magistrate Case No. _____
8.  Does this case relate to a previously filed matter in this District Court? (Yes or No) __Yes__
    If yes, Judge David S. Leibowitz          Case No. 22-20521-CR-Leibowitz(s)
9.  Defendant(s) in federal custody as of 08/09/2023
10. Defendant(s) in state custody as of N/A
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) __No__
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Mills Maynard)? (Yes or No) __No__
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) __No__
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? __No__
16. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? __No__

By: _____
        Kate T. McCarthy
        DOJ Trial Attorney
        SDFL Court ID No.     A5502801

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**  THEORDORE FARNSWORTH

**Case No:**  22-20521-CR-Leibowitz(s)

Count #: 1

Title 15 United States Code, Sections 78j(b) and 78ff; 17 C. F. R.§240.10b-5

Securities Fraud
* **Max. Term of Imprisonment:** 20 years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $5 Million or twice the Gross Gain or Gross Loss

Count #: 2

Title 18, United States Code, Section 371

Conspiracy to Commit Securities Fraud
* **Max. Term of Imprisonment:** 5 Years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the Gross Loss or Gross Gain

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   22-20251-CR-Leibowitz(s) |
| | ) | |
| Theodore Farnsworth, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

      I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

      After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

 

_____
*Defendant's signature*


_____
*Signature of defendant's attorney*


_____
*Printed name of defendant's attorney*


_____
*Judge's signature*


_____
*Judge's printed name and title*